```
               UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY


DR. WAGIH H. MAKKY,              :
                                 :    HONORABLE JOSEPH E. IRENAS
          Plaintiff,             :
                                 :    CIVIL ACTION NO. 06-4329 (JEI)
     v.                          :
                                 :           OPINION
MICHAEL CHERTOFF, Secretary of:
the Department of Homeland       :
Security, in his official        :
capacity; KIP HAWLEY,            :
Director, Transportation         :
Security Administration, in      :
his official capacity;           :
DEPARTMENT OF HOMELAND           :
SECURITY; TRANSPORTATION         :
SECURITY ADMINISTRATION;         :
OFFICE OF PERSONNEL              :
MANAGEMENT; and FEDERAL          :
BUREAU OF INVESTIGATION,         :
                                 :
          Defendants.            :
```

**APPEARANCES:**

SETON HALL UNIVERSITY SCHOOL OF LAW
CENTER FOR SOCIAL JUSTICE
By: Baher Azmy, Esq.
    Joseph Farano, Clinic Student
    Jesse Ehnert, Clinic Student
    Alexandra Pitney, Clinic Student
833 McCarter Highway
Newark, NJ 07102
    Counsel for Plaintiff

U.S. DEPARTMENT OF JUSTICE
By: Steven Yale Bressler, Esq.
20 Massachusetts Avenue, NW
Washington, DC 20001

CHRISTOPHER CHRISTIE, UNITED STATES ATTORNEY
By: Yanet Perez Noble, Esq.
970 BROAD STREET
Room 700
Newark, NJ 07102
    Counsel for Defendants

**IRENAS**, Senior District Judge:

This is an employment discrimination suit filed by Dr. Wagih H. Makky ("Dr. Makky"), a former employee of the Transportation Security Administration ("TSA"). Dr. Makky, an American citizen of Egyptian descent who is an Arab and a Muslim, asserts that he was subjected to persistent prejudice and derogatory comments on account of his national origin and religion, in violation of Title VII, 42 U.S.C. § 2000e-16(a), and the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. § 2303(b). Specifically, Dr. Makky claims employment discrimination under Title VII (Count One); employment discrimination under the CSRA (Count Two); violation of the procedural due process protections of the Fifth Amendment (Count Three); violation of agency procedures under the CSRA (Count Four); retaliation under the CSRA (Count Five); violation of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(3)(A) (Count Six); and violation of the Privacy Act, 5 U.S.C. § 552a(d)(1) (Count Seven).

Defendants move to dismiss Counts One, Two and the claim of discriminatory bias in Count Three of the Complaint for lack of subject matter jurisdiction. Defendants move for summary judgment on all other counts.

2

**I.**

In 1978, Dr. Makky moved to the United States from Egypt.
He married a U.S. citizen in 1981, and received a Ph.D. in 1983.
In 1987 he became a U.S. citizen.  Prior to working for the TSA,
Dr. Makky was an Associate Professor at the University of
Illinois, and a scientist at government research facilities and
at the Naval Oceans Systems Center.  On September 28, 1990, Dr.
Makky was hired by the Federal Aviation Administration ("FAA"),
as an Electronics Engineer in the Aviation Security Research and
Development Lab in Atlantic City. (Def. Exh. 4, ¶1).[1]  He was
given a "secret" level security clearance.[2]

In March, 2002, approximately six months after September
11th, Dr. Makky submitted a routine security clearance renewal.[3]
The following October, 2002, Mr. Robin Burke became the Deputy
Administrator in charge of the Security Lab, and thus, Dr.

---

[1] In 2002, the FAA became known as the TSA.

[2] In 1996, the security clearance requirement of the
position was heightened from "secret" to "top secret."  (Compl.
¶¶ 28, 36).  Dr. Makky's security clearance was upgraded to "top
secret" at that time.

[3] This appears to be the first renewal he submitted since
1995, and thus the first submitted to the TSA.  Defendants argue
that because this was the first time Dr. Makky requested security
clearance from the TSA, it was not a request for renewal.
According to Defendants' description, the security clearances of
FAA employees were generally honored by the TSA, barring specific
concern about individual employees.  Because FAA employees were
not required to reapply for security clearances when the FAA
became the TSA, Plaintiff's characterization of Dr. Makky's
action as a request for renewal is appropriate.

Makky's supervisor. (Compl. ¶42).  On his initial visit to the Security Lab, Mr. Burke met with only one non-supervisory employee individually - Dr. Makky.  In that meeting, Mr. Burke allegedly asked Dr. Makky about his national origin, and thereafter inquired into Dr. Makky's security clearance renewal application, including obtaining Dr. Makky's FBI file in early 2003.

On March 19, 2003, Dr. Makky was placed on administrative leave. (Def. Ex. 8, p.2).  On March 28, 2003, Mr. Burke, on behalf of the TSA, sent Dr. Makky a letter indicating that he was placed on paid administrative leave due to questions concerning his security clearance. (Def. Ex. 4, ¶3).  That August, Mr. Burke asked Dr. Makky to submit another security clearance renewal. Dr. Makky complied.

While it is unclear from the record what occurred during the interim, on January 19, 2005,[4] the Office of Transportation, Vetting & Credentials ("OTVC") issued an Initial Determination to Dr. Makky notifying him that a non-final determination was made that his access to National Security Information was denied. (Def. Ex. 4, ¶4).  The letter was sent from Joy S. Fairtile, Associate Deputy Director of the OTVC, and listed the specific

_____

[4] Although the parties stipulated that it was issued on January 19, the Notice of Initial Determination itself is dated January 18, 2005. (Def. Ex. 5).

4

findings made by the OTVC that supported its decision.[5] (Def. Ex.
5).

Upon Dr. Makky's request, the Office of Personnel Management
("OPM") granted him access to 136 pages of his 148-page background
investigation file upon which the initial determination was based.
(Baker Supp. Decl., ¶8).  The OPM referred ten additional pages to
the FBI for review, as these documents originated with the FBI.
(Id. at ¶10).  The FBI ultimately granted Dr. Makky access to
seven pages with redactions, and withheld three pages. (Def. Ex.
10, p.3).  Another document, labeled a "processing document" and
solely containing personal information about Dr. Makky, including
his date of birth, social security number, height, weight, etc.,
was not disclosed until March 27, 2007. (Baker Supp. Decl., ¶11
and attachment).  The final document, a generic cover sheet for
documents containing national security information deemed "secret"
was not disclosed because it was not part of Dr. Makky's
background investigative file and thus not responsive to his
document request.  (Id. at ¶12).

On April 18, 2005, Dr. Makky responded to the Initial
Determination in writing. (Def. Ex. 4, ¶5).  The OTVC, in turn,
sent Dr. Makky a Notice of Proposed Suspension for an Indefinite
Period on August 8, 2005, for failure to maintain eligibility for

---

[5] The findings included concerns regarding Dr. Makky's
allegiance to the United States and foreign influence, foreign
preference, and misuse of information technology systems.

access to national security information. (Def. Ex. 4, ¶6; Def. Ex. 8). This notice informed him of the proposal that he be suspended indefinitely without pay pending a final determination because it was a condition of his employment that he have a top secret security clearance. On August 24, 2005, Makky responded in writing, through counsel, to the August 8 Notice. (Def. Ex. 4, ¶7). He also responded orally, through a presentation to TSA officials including Mr. Burke. (Id.). On September 7, 2005, the OTVC imposed the suspension for an indefinite period, effective as of September 8, 2005. (Def. Ex. 4, ¶8; Def. Ex. 9). The decision was signed by Mr. Burke. (Def. Ex. 9).

In further response to the Initial Determination, Dr. Makky made an oral presentation on December 16, 2005, (Def. Ex. 4, ¶5), and submitted an additional written response to the Initial Determination on December 27, 2005. (Id.). On March 7, 2006, the TSA issued a Final Denial of Security Clearance, upholding its initial decision to deny security clearance.[6] (Def. Ex. 6). It was signed by Douglas I. Callen, Chief Security Officer. (Id.). On August 18, 2006, DHS sent Dr. Makky a letter indicating that the DHS Security Appeals Panel unanimously concluded that he did not meet the standard for access to classified information. (Def. Ex.

---

[6] Because the Court characterizes Dr. Makky's application for security clearance with the TSA as a request for renewal, the TSA's "denial of security clearance" was technically a revocation.

7).

Dr. Makky appealed his suspension to the Merit Systems Protection Board ("MSPB" or "the Board") on October 5, 2005. (Def. Ex. 1).  Administrative Judge Michael H. Garrety ("AJ Garrety") held a hearing on January 13, 2006, and on April 4, 2006, issued an Initial Decision that affirmed the Department of Homeland Security's actions. (Id.).  On May 9, 2006, Dr. Makky petitioned the full Board for a review of the AJ's decision. (Compl. ¶101).  The Board denied Dr. Makky's petition on August 15, 2006, and adopted the AJ's decision as the final decision of the Board. (Compl. ¶102).  On September 14, 2006, Dr. Makky commenced this action.

## II.

This Court has jurisdiction to review the determinations of the MSPB because this is a "mixed case," one that contains allegations of employment discrimination as well as claims of procedural violations.  5 U.S.C. § 7703(b)(2).[7]

Dr. Makky advocates for *de novo* review of both his

---

[7] *See also Discenza v. England,* 2007 U.S. Dist. LEXIS 3221, *19 (D.N.J. January 17, 2007)("[a]ccording to the statutory scheme governing review of MSPB final orders, if a federal employee wants to pursue any type of discrimination claim on appeal, the employee must file a complaint in a federal district court, as the federal district court is the only forum in which an employee can appeal both parts of a mixed claim."); *Desmond v. Gober,* 2006 U.S. Dist. LEXIS 51395, *26 (D.N.J. July 27, 2006).

discrimination and non-discrimination claims, but cites no case law in support of his position.  While the Third Circuit has not determined the standard of review in mixed cases, other circuits have uniformly held that a bifurcated standard of review applies, where discrimination claims are reviewed *de novo*, and other claims are reviewed on the administrative record.  *See Kelliher v. Veneman*, 313 F.3d 1270, 1275 (11th Cir. 2002)("We have found no case law in this or any other Circuit that would require a de novo review of claims other than discrimination claims presented in a 'mixed case.'  Courts that have addressed the issue uniformly apply the de novo standard of review only to the discrimination claims while other claims adjudicated before the MSPB are reviewed on the record."); *Carr v. Reno*, 23 F.3d 525, 528 (D.C. Cir. 1994); *Mason v. Frank*, 32 F.3d 315, 317 (8th Cir. 1994); *Williams v. Rice*, 983 F.2d 177, 179-80 (10th Cir. 1993); *Morales v. Merit Sys. Protection Bd.,* 932 F.2d 800, 802 (9th Cir. 1991); *Johnson v. Burnley*, 887 F.2d 471, 474 n.1 (4th Cir. 1989); *Williams v. Dept. of the Army*, 715 F.2d 1485, 1488 (Fed. Cir. 1983).[8]

Morever, 5 U.S.C. § 7703(c) expressly requires that the Court of Appeals for the Federal Circuit review non-discrimination claims on the administrative record.  We see no logical basis for

---

[8] Trial courts in this circuit have also applied a bifurcated standard of review.  *See Bailey v. Principi*, 2003 U.S. Dist. LEXIS 7680, *10 (E.D. Pa. April 30, 2003); *D'Antonio v. Runyon*, 3 Am. Disabilities Cas. (BNA) 1658(E.D. Pa. 1994).

adopting a different standard for the same claims simply because the claims were filed together with discrimination claims in district court.  Thus, in reviewing the non-discrimination claims, we are limited to review of the administrative record and must affirm the MSPB decision unless it is: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence . . ."  5 U.S.C. § 7703(c).  We review discrimination claims *de novo. Id.*

When considering Defendants' motions to dismiss, the Court must accept as true all well-pleaded allegations in the Complaint and view them in the light most favorable to Plaintiff.  *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). The Court must accept as true any and all reasonable inferences derived from those facts.  *See Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 (3d Cir. 1994).  In addition to the allegations of the Complaint, the Court may consider documents attached to or specifically referenced in the Complaint, and matters of public record, without converting the motion to dismiss into one for summary judgment.  *See Mele v. Federal Reserve Bank of N.Y.*, 359 F.3d 251, 255 n.5 (3d Cir. 2004); *Sentinel Trust Co. v. Universal Bonding Ins. Co.*, 316 F.3d 213, 216 (3d Cir. 2003).

9

### III.

Before the Court is Defendants' motion to dismiss Count One of the Complaint, which alleges national origin and religious discrimination under Title VII based upon the TSA's suspension of Dr. Makky without pay.[9]  Defendants contend that we do not have jurisdiction to review the denial of Dr. Makky's security clearance, and thus we cannot review his termination based upon the denial of clearance.  Dr. Makky, however, does not contest the

---

[9] Count One specifically names Defendants Chertoff, Hawley, DHS, and TSA.  Because the only proper defendant in a Title VII action is the "head of the department, agency, or unit" concerned, 42 U.S.C. § 2000e-16(c), DHS and TSA are not proper defendants. *See Owens v. United States,* 822 F.2d 408, 41 n.6 (3d Cir. 1987).  It is clear that the head of DHS, Michael Chertoff, can be sued under Title VII.  Whether the head of TSA, Kip Hawley, is a valid Title VII defendant depends on whether the TSA is an "Executive agency" under 5 U.S.C. § 105.  *See Hancock v. Egger,* 848 F.2d 87, 88-9 (6th Cir. 1988)(noting that this statute defines the term "agency" as used in 42 U.S.C. § 2000e-16).  An Executive agency is defined as an Executive department, a Government corporation, or an independent establishment. 5 U.S.C. § 105.

The DHS is listed under 5 U.S.C. § 101 as an Executive department, but the TSA is not.  The TSA does not appear to fit within the definition of Government corporation as defined by 5 U.S.C. § 103.  Moreover, the Third Circuit has held that "'Government corporation,' defined by 5 U.S.C. § 103, does not include the DOD [Department of Defense] or any of its parts." *Defense Criminal Investigative Service (DCIS), Dep't of Defense (DOD) v. Federal Labor Relations Authority,* 855 F.2d 93, 98 (3d Cir. 1988).  We see no distinction in this context between the DOD and the DHS.  Lastly, "'[i]ndependent establishments' are defined by 5 U.S.C. § 104 in such a way as to exclude any Executive departments or parts thereof." *Id.*  Therefore, because the TSA does not fall within the definition of an Executive agency, Kip Hawley is not a proper Title VII defendant.

security clearance determination.[10]  Rather, his sole argument is that the decision to place him on unpaid leave on September 8, 2005, was discriminatory because the TSA could have selected one of two less severe options; it could have permitted Dr. Makky to remain on administrative leave or transferred him to a position that does not require a security clearance.  Thus, Dr. Makky argues that the Court has jurisdiction because it need not review

_____

[10] Despite this concession, to the extent that Dr. Makky's Complaint alleges discrimination in the recision of his security clearance, we note that neither the decision to investigate Dr. Makky's security clearance nor the denial thereof can be reviewed by this Court.  As the Fourth Circuit held in *Becerra v. Dalton*, 94 F.3d 145, 149 (4th Cir. 1996), in the context of a claim of retaliation for filing EEOC complaints, the decision to initiate a security clearance is not reviewable.

> [Plaintiff] attempts to distinguish his case by arguing that no court has addressed the issue of whether the instigation of the investigation into the security clearance as a form of retaliation is judicially reviewable.  <u>We find that the distinction between the initiation of a security investigation and the denial of a security clearance is a distinction without a difference</u>.  The question of whether the Navy had sufficient reasons to investigate the plaintiff as a potential security risk goes to the very heart of the 'protection of classified information [that] must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it.'

*Id.* (internal citations omitted)(emphasis added).
    Moreover, in *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988), the Supreme Court held that "the grant of security clearance to a particular employee, a sensitive and inherently discretionary judgment call, is committed by law to the appropriate agency of the Executive Branch."  Subsequent decisions have applied this rationale to employment actions brought in federal court.  *See, e.g., Stehney v. Perry*, 101 F.3d 925, 931 (3d Cir. 1996).

the security clearance determination to review the claims of discrimination.  *See Stehney v. Perry,* 101 F.3d 925, 932 (3d Cir. 1996).

Dr. Makky urges the Court to apply a mixed-motive analysis to determine that race and/or national origin was a motivating factor in his suspension.[11]  We note first, however, that Dr. Makky's discrimination claims do not survive under the *McDonnell Douglas* pretext framework.  *See McDonnell Douglas v. Green,* 411 U.S. 792 (1973); *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989).  To establish a *prima facie* case under *McDonnell Douglas*, Dr. Makky must show: "(1) that he is a member of a protected class; (2) that he is qualified for the position; (3) that he was either not hired or fired from that position; (4) under circumstances that give rise to an inference of unlawful discrimination such as might occur when the position is filled by a person not of the protected class."  *Jones v. School Dist*., 198 F.3d 403, 410-11 (3d Cir. 1999)(internal quotations omitted).

Dr. Makky cannot establish prong two, that he was qualified for the position.  It is undisputed that Dr. Makky's former position, Electronics Engineer, requires a security clearance.  Therefore, because his security clearance was revoked by the

---

[11] Although Dr. Makky relies upon the mixed-motive theory of discrimination, he expressly does not limit himself to pursuing this theory.  Thus, we will analyze his claims under both a pretext and a mixed-motive theory.

January 19, 2005 OTVC Initial Determination, he was not "qualified" for the position from which he was suspended.

Similarly, Dr. Makky cannot state a claim under the *Price Waterhouse* mixed-motive/direct evidence framework. "Under *Price Waterhouse*, when [a] plaintiff alleging unlawful termination presents 'direct evidence' that his [religion and national origin] was a substantial factor in the decision to fire him, the burden of persuasion on the issue of causation shifts, and the employer must prove that it would have fired the plaintiff even if it had not considered his [religion and national origin]." *Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 (3d Cir. 2002). A defendant who successfully asserts an affirmative defense may still be subject to declaratory relief, injunctive relief, and attorney's fees and costs. *See Desert Palace, Inc. v. Costa,* 539 U.S. 90, 94-95 (2003); 42 U.S.C. § 2000e-5(g)(2)(B).

Under this theory, Dr. Makky must show that his religion or national origin was a motivating factor in Mr. Burke's decision to indefinitely suspend him without pay after the OTVC issued the Initial Determination to revoke his security clearance. Thus, the issue can be framed as to what action the TSA could have taken with respect to Dr. Makky between the Initial Determination on January 19, 2005, which led to his suspension on August 8, 2005, and the August 15, 2006, final decision of the MSPC, which is not challenged before this Court.

In undertaking a mixed-motive analysis, the Court must look to the alleged non-discriminatory reason, as well as the alleged discriminatory reason for the adverse employment action, in order to determine whether the latter was a motivating factor.  While this is feasible in most circumstances, the Court cannot conduct this analysis when the non-discriminatory reason proffered by the Defendants is that the Plaintiff is not qualified for the position because he cannot maintain the required security clearance.  Under *Egan* and its progeny, a court cannot review national security determinations.[12]

Morever, the decision to suspend Dr. Makky was, at a minimum, permitted by internal directive, if not suggested or even required.  This directive, a TSA memorandum from Richard Whitford, Assistant Administrator for Human Resources, (the "Whitford Memorandum" or "the Memorandum") dated April 20, 2004, discusses the use of indefinite suspensions.  The Memorandum addresses TSA Management Directive 1100.75-1, which provides that "an employee *may* be suspended indefinitely for matters in which . . . [the] TSA is *conducting an investigation* of conduct that it reasonably believes was committed by the employee in question and is so serious that if it proves to be true, the employee's continued presence at the worksite would represent a threat to life,

---

[12] Similarly, if this claim were to go to trial, the trier of fact would face the same dilemma.

14

property, safety or the effective operation of workplace." (Def.
Ex. 3)(emphasis added).

In clarifying the meaning of "conducting an investigation,"
the Memorandum notes that the phrase includes a wide range of
circumstances.  It states that "if management determines that the
employee should not be allowed to remain in the workplace in any
capacity pending the outcome of the matter, management should
immediately initiate action proposing to suspend the employee
indefinitely[.]" (Id.).

Listed in the Memorandum are three examples of situations in
which indefinite suspensions are appropriate.  The first is "where
an employee's security clearance has been denied or revoked and
the matter is pending further review or appeal."  (Id.).  It
explains, in a footnote, that in a situation calling for a
suspension, the employee may be placed on administrative leave for
"no more days than required to effect an indefinite suspension."
(Id.).  Thus, the TSA's placement of Dr. Makky on indefinite
suspension was in accordance with the policy outlined in the
Whitford Memorandum.[13]

The alternative offered by Dr. Makky, that Mr. Burke could

_____

[13] There was, however, approximately a seven month gap
between the TSA's initial determination and their placement of
Dr. Makky on indefinite suspension.  As explained by Defendants
at oral argument, this delay was a result of Dr. Makky's file
sitting unreviewed on someone's desk.  When the file was
reviewed, in accordance with the Whitford Memorandum, Dr. Makky
was placed on administrative leave.

have allowed him to remain on administrative leave pending a final determination by the Board, is discredited by the Memorandum because the initial determination gave the TSA "apparently reliable information" that Dr. Makky's continued presence at work could "threaten workplace safety or security, or effective operations." (Id.).  Thus, Dr. Makky should have been placed on administrative leave, if at all, for no more days than required for the TSA to effect the indefinite suspension. (Def. Ex. 3).

Therefore, what remains is the assertion that Mr. Burke's decision to suspend Dr. Makky, rather than transfer him to a position not requiring a security clearance, was motivated by Mr. Burke's discriminatory animus.  It is not clear from the record whether transferring Dr. Makky was a viable option.[14]  However, even if Mr. Burke should have transferred Dr. Makky instead of suspending him, the Court is barred from analyzing this decision because it cannot review the propriety of the non-discriminatory reason for the action, i.e., the revocation of Dr. Makky's security clearance.  Because as a matter of law Dr. Makky cannot prevail on either a mixed-motive or a pretext theory, Defendants' motion to dismiss Count One will be granted.

---

[14]   Even if there were open positions not requiring a security clearance to which Dr. Makky could have been transferred, there are many reasons the agency may not have done so.  For example, because Dr. Makky lost his security clearance due to national security concerns, the agency may not have wanted Dr. Makky to work for the governmental entity in charge of national security, and particularly not with employees who have access to secure information.

Defendants also move to dismiss Count Two of the Complaint, alleging employment discrimination under the CSRA, and the employment discrimination claim in Count Three of the Complaint, which purports to allege Fifth Amendment Due Process violations. Defendants' motion will be granted because, as a federal employee, Dr. Makky's exclusive remedy for his employment discrimination claims lies in Title VII.  *See* 42 U.S.C. § 2000e-2; *Robinson v. Dalton*, 107 F.3d 1018, 1020-21 (3d Cir. 1997); *Kizas v. Webster*, 707 F.2d 524, 542 (D.C. Cir. 1983)("The Title VII remedy declared exclusive for federal employees in *Brown v. GSA* precludes actions against federal officials for alleged constitutional violations as well as actions under other federal legislation").

Because Count Three states that the alleged decision-maker, Mr. Burke, "was biased against Dr. Makky on account of Dr. Makky's national origin and religion," (¶ 113), this is clearly a claim of discrimination.  Thus, it must be brought under Title VII.  *See Brown v. GSA,* 425 U.S. 820, 829 (1976); *Owens v. United States,* 822 F.2d 408, 410 (3d Cir. 1987); *Gissen v, Tackman,* 537 F.2d 784 (3d Cir. 1976).  Therefore, Count Two and the discriminatory bias claim in Count Three of the Complaint will be dismissed for lack of subject matter jurisdiction.

## IV.

Defendants move for summary judgment on the Due Process

violations alleged in Count Three as well as the CSRA procedural errors alleged in Count Four of the Complaint.  Both claims stem from Defendants Chertoff, Hawley, DHS, and TSA's purported failure to provide information to Dr. Makky, which he claims denied him a meaningful opportunity to respond to the suspension determination.

The procedure covering Dr. Makky's suspension is set forth in the TSA's personnel regulations, promulgated pursuant to 49 U.S.C. § 114(n),[15] and codified in Management Directive ("MD") 1100.75-3 ("MD 75-3")(Def. Ex. 2).  MD 75-3(6)(H)(3)(a)(1)(a)&(i) mandates that an employee be provided notice of an adverse action, including information of the charges and specifications for each charge, as well as a description of the evidence supporting the charges.  It further provides that "[t]he employee should be provided a copy of the material relied upon to support each charge and specification with the letter.  Alternatively, if the material is voluminous or contains sensitive information, the employee shall be given the opportunity to review the material at a designated TSA location."  *Id.*

---

[15]  This section reads, "Personnel management system.  The personnel management system established by the Administrator of the Federal Aviation Administration under section 40122 [49 U.S.C. § 40122] shall apply to employees of the Transportation Security Administration, or, subject to the requirements of such section, the Under Secretary may make such modifications to the personnel management system with respect to such employees as the Under Secretary considers appropriate, such as adopting aspects of other personnel systems of the Department of Transportation." 49 U.S.C. § 114(n).

The allegation of a delay in disclosure of documents stems
from the purportedly incomplete and inconsistent production of
documents requested by Dr. Makky from the agency and the FBI.  The
record reveals that the TSA and the FBI released information to
Dr. Makky at various times due to ongoing decisions regarding the
proper classification of information.[16]

The Initial Determination to suspend Dr. Makky was expressly

---

[16]   The timeline is as follows.  On February 1 and 14, and
March 3, 2005, Dr. Makky sent a FOIA request for documents used
in his investigation to the OPM.  On March 10, 2005, the OPM sent
Dr. Makky two documents from his file. (Hardy Dec. Ex. A).  Dr.
Makky, on April 6, 2005, sent the OPM a notarized authorization
to release information contained in his file regarding his wife.
(Azmy Dec. Ex. E).  On April 20, 2005, the OPM responded with
copies of these previously withheld documents. (Id.).  The OPM
then sent another letter to Dr. Makky on September 22, 2005,
releasing two documents without any redactions. (Azmy Dec. Ex.
F).  On August 18, 2005, the FBI sent the OPM a letter advising
it that two pages with bracketed information could be released in
full. (Hardy Dec. Ex. C).  That day, the FBI sent Dr. Makky a
letter noting that it reviewed the ten pages of his file and
would release to him four pages with redactions, and withhold the
remaining documents. (Hardy Dec. Ex. B).  The FBI also provided
Dr. Makky with information on how to appeal the decision. (Id.).
Dr. Makky appealed the partial and full withholdings set forth in
a August 18, 2005, letter from the OPM on October 17, 2005.
(Hardy Dec. Ex. D).
     On March 7, 2006, the TSA issued a final denial of security
clearance, from which Dr. Makky appealed.  The OPM then sent Dr.
Makky a copy of his background investigation file on May 26,
2006, and noted that it withheld six documents and redacted
others. (Azmy Dec.  Ex. G).  On August 18, 2006, Dr. Makky's
appeal was denied.  On September 14, 2006, Dr. Makky filed this
Complaint.  On  December 11, 2006, the FBI sent Dr. Makky a
second redacted set of documents responsive to Dr. Makky's FOIA
request, which released six documents in redacted form, and
withheld four. (Azmy Dec. Ex. C).  On January 5, 2007, the FBI
sent Dr. Makky a letter releasing additional material on three of
the pages from his file. (Azmy Dec. Ex. D).

made based upon questions regarding his: (1) allegiance to the United States and possible foreign influence due to the fact that he is a dual citizen of the United States and Egypt, has close relatives that are foreign nationals, and that he visited several countries, some for over a month, without indicating the reason for this travel; (2) possible preference for Egypt over the United States because of his dual citizenship; and (3) misuse of his computer for "other than Government related traffic." (Def. Ex. 5).

Dr. Makky was given the opportunity, and did in fact, respond to these determinations in writing twice, and in person before the agency, represented by counsel.  He was also granted two extensions and given access to documents in his file upon which the decision was based.  Although he did not receive some information from his file until after the final determination suspending him indefinitely was made,[17] there is no evidence that Dr. Makky was harmed by the delay.  Dr. Makky does not point to any information provided to him after the final determination that he could have used to mitigate the agency's concerns.

In the TSA's final determination, it found that although Dr. Makky's responses mitigated the security concerns raised by his dual citizenship, his visits to foreign countries, his foreign

---

[17]   Additionally, Dr. Makky has not been granted access to documents that the agency found fell within FOIA exemption § 552(b)(1), governing information that should be kept secret due to the interest of national defense or foreign policy.

preference, and the misuse of his computer, they did not allay the agency's concerns regarding his relatives and associates in Egypt due to "information contained in a classified report from the . . . [FBI], your association with foreign nationals and/or individuals connected with a foreign government and your responses to questions posed to you by the FBI during several interviews that occurred between 1999 and 2002." (Def. Ex. 6).  Arising out of these events are allegations of both Due Process violations and CSRA procedural errors.

A.    Count Three- Due Process Violation

Dr. Makky alleges in Count Three that Defendants violated his Fifth Amendment Due Process rights because the determination to suspend him was made in violation of applicable agency procedures, and he was not given adequate opportunity to contest the determination.  Because this claim is not based upon discrimination, it must be reviewed on the administrative record.[18] 5 U.S.C. § 7703(c).

A public employee "must make two showings to establish that the dismissal violated due process: (1) that the dismissal deprived him of a property or liberty interest, and (2) that the employer did not afford him adequate procedural protections in

---

[18]    The Court, therefore, rejects Plaintiff's argument that we must review this claim *de novo* and thus summary judgment is premature.

21

connection with the action." *Richardson v. Felix*, 856 F.2d 505, 507 (3d Cir. 1988), *citing Federal Deposit Ins. Corp. v. Mallen,* 486 U.S. 230 (1988); *Cleveland Bd. of Education v. Loudermill,* 470 U.S. 532, 538-41 (1985).

The first prong is satisfied because Dr. Makky can only be terminated for cause.  "The hallmark of a constitutionally protected property interest is an individual entitlement that 'cannot be removed except 'for cause.'"  *Richardson,* 856 F.2d at 509*, quoting Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430 (1982).  Pursuant to MD 1100.75-3(6)(B), Dr. Makky could only be terminated for cause.  Thus, the question is whether the agency afforded him adequate procedural protections in connection with his suspension.  This two-fold analysis involves an inquiry into Mr. Burke's involvement in the decision to suspend Dr. Makky without pay, and of the adequacy of the notice given to Dr. Makky in connection with this suspension.  Because the MSPB relied upon AJ Garrety's opinion, we will look to the AJ's decision in determining whether it should be upheld.

The allegations regarding Mr. Burke's involvement in Dr. Makky's suspension arise out of Mr. Burke's purported failure to abide by agency regulations requiring that proposed suspensions be approved by a supervisor higher in the chain of the employee's command than the supervisor who proposed the suspension.  (Compl. ¶ 67, citing MD 1100-75.36(H)(3)(a)(3)).  The allegations, as

summarized by AJ Garrety, are that:

> Robin C. Burke was both the deciding official and the *de
> facto* proposing official for the agency's adverse action.
> The notice of proposed suspension states that the
> proposing official was Dr. Susan Hallowell, the director
> of the laboratory in which [Dr. Makky] worked, but the
> testimony at the hearing indicated that her role in this
> matter was limited to signing the notice, which had been
> drafted by Jill Jennings, a human resources specialist,
> after consultation with Philip Fletcher, an agency
> employee who reported to Mr. Burke.  In addition, Burke
> 'signed-off on the grid' for the notice, *i.e.*, he
> initialed his approval for its issuance to [Dr. Makky].

(Def. Ex. 1, p.5)

AJ Garrety concluded that the agency did not violate the
management directive despite Mr. Burke's involvement in the
decision to propose Dr. Makky's suspension.  He reasoned that Mr.
Burke's conduct was not unusual - "[d]eciding officials often have
involvement in the events preceding the taking of adverse action
against an employee"- particularly because Dr. Makky was a high-
level employee implicated in a national security investigation.
(Def. Ex. 1, p.6).  Moreover, he opined that even if Mr. Burke was
predisposed to suspending Dr. Makky, because he placed Dr. Makky
on administrative leave for almost two years before suspending
him, AJ Garrety found it "highly improbable" that another
individual would have taken a different course of action. (Id.).

Furthermore, even if the directive was violated, AJ Garrety
noted that Dr. Makky could not show that it likely caused the TSA
to reach a different decision due the facts that: Dr. Makky's job

required a security clearance; he lost his security clearance; the agency's policy set forth in the Whitford Memorandum provide for indefinite suspension in this circumstance; and Dr. Makky pointed to no statute or regulation demonstrating that he had the right to be reassigned to a different position.  (Id.).

We will affirm AJ Garrety's decision because we find that it was made in accordance with the law, obtained by following the applicable procedures, and supported by substantial evidence.  *See* 5 U.S.C. § 7703(c).  Dr. Makky does not contend, and we do not find, that AJ Garrety's application of the law or recitation of the facts are erroneous.  There were several individuals involved in the decision to suspend Dr. Makky after the initial decision was made to revoke his security clearance.  Although Dr. Makky alleges that Mr. Burke violated agency procedure by being both the deciding official and the *de facto* proposing official, there is no evidence that Mr. Burke exerted control over all three of the individuals involved in the proposal.  Moreover, his decisions to place Dr. Makky on administrative leave and suspend him after the Initial Determination denying his security clearance were in accordance with agency regulation.  Any communication Mr. Burke had with the proposing officials did not rise to the level of a Due Process violation.

As to the second prong, AJ Garrety held that, pursuant to the applicable agency regulation, the August 8, 2005, notice gave Dr.

24

Makky an "adequate opportunity to make a meaningful response to the proposed indefinite suspension," (Def. Ex. 1, p.3), and that he did so respond.  He also noted that while some information might have been withheld, he could not review the decision to withhold classified information, stating:

> Although [Dr. Makky] alleged . . . that the OTVC failed to disclose some of the evidence on which its initial decision was based, despite his entitlement to such information under Executive Order 12968, Access to Classified Information . . . I cannot address that issue, as doing so would require me to review the procedure the OTVC follows in making access determinations, which is not permitted. *Alston,* 75 F.3d at 662.

(Id.).

     In finding the notice given was sufficient, AJ Garrety expressly relied upon *King v. Alston,* 75 F.3d 657, 661-62 (Fed. Cir. 1996).  In *King,* the court determined that an agency must give an employee notice of the reasons for suspension such that the employee has an "adequate opportunity to make a meaningful reply to the agency before being placed on enforced leave." *Id.* at 661-62.[19]  It held that the agency gave King sufficient notice when it informed him that his access to classified information was

_____

     [19]  The ruling in *King* was based upon the language contained in 5 U.S.C. § 7513, which provides that, before a federal agency takes an adverse action against an employee, the employee must receive notice and reasons for the proposed action so that he has an adequate opportunity to respond.  Although TSA is exempt from § 7513, *see* 49 U.S.C. § 114(n), the TSA has analogous, although less onerous, requirements under MD 75-3.  Therefore, the AJ did not err in applying *King* to facts of this case.

temporarily suspended "because [he] may suffer from a medical condition which requires further investigation and evaluation," and then placed him on administrative leave and gave him opportunity to respond. *Id.* at 659.

In support of his allegation that the decision was contrary to law, Dr. Makky asserts the MSPB's reliance on *King* in informing its decision of adequate notice in this case was erroneous in light of *Cheney v. DOJ,* 479 F.3d 1343 (Fed. Cir. 2007). The *Cheney* court found that the DEA, the federal agency for which Cheney worked, failed to provide him with sufficient reasons for his suspension of security clearance because it did not provide enough specificity for Cheney to meaningfully respond. The DEA informed Cheney of its initial decision to suspend his security clearance due to "potentially derogatory personal conduct and possible violations of law and DEA Standards of Conduct" as well as failure to comply with security regulations and a "demonstrated pattern of dishonesty and/or rule violations." *Id.* at 1345.

Cheney requested additional information, and was told that the decision to suspend his security clearance was,

> based upon allegations that you inappropriately queried or caused to be queried Law Enforcement Data Bases and abused the Administrative Subpoena process. Additionally, it is believed that you are in violation of the confidentiality agreement you entered into with the Office of Professional Responsibility during their investigation into these issues.

*Cheney*, 479 F.3d at 1346. Cheney stated that he "had reason to

26

query the DEA databases 'thousands of times' over the course of his career and that he also had 'frequent occasions' to utilize the administrative subpoena process.'" *Id.* at 1348.  Thus, the Court held that the procedural requirements were not satisfied because the DEA failed to provide "specific information regarding the time frame of Mr. Cheney's alleged misconduct" and did not identify specific database queries or describe in what way Cheney abused the administrative process.  *Id.* at 1352.

*Cheney* is not binding on this Court and is distinguishable.[20] The agency regulations here, as set forth above, require a less detailed disclosure than those in *Cheney*.[21]  Moreover, unlike Cheney, Dr. Makky was provided a thorough description of the reasons for his security clearance denial in the TSA's Initial Determination letter of January 18, 2005.  He was also given documentary evidence to support this decision, and he provided detailed responses to the allegations contained in the notice. Our review is limited to whether the information given to Dr.

---

[20] Moreover, *Cheney,* decided by a divided panel, contradicts the Fourth Circuit's decision in *Jamil v. Dep't of Defense,* that "the agency did not have to justify the revocation of the security clearance.  It only had to explain that the lack of a clearance was the basis for its decision to fire him." 910 F.2d 1203, 1208 (4th Cir. 1990)(finding notice of defendants intent to revoke plaintiff's security clearance for "financial irresponsibility" was sufficient under § 7513).

[21] The regulations in *Cheney* require that an employee be given, among other things, "a written decision and the specific reasons therefore at the earliest practicable date."  *Cheney,* 479 F. 3d at 1349, quoting 5 U.S.C. § 7513(b).

Makky allowed him to meaningfully respond to the notice of proposed suspension.  We cannot review the agency's specific decisions about the type and extent of information it disclosed because the power to control access to national security information is properly left to the Executive Department.  *See Egan,* 484 U.S. at 527.

AJ Garrety found that Dr. Makky was given all of the information to which he was entitled.  He also held that he could not address the issue of whether Dr. Makky was actually entitled to information that FBI deemed "classified."  These decisions were supported by substantial evidence and made in accordance with the law.  We therefore hold that because the Board did not err in finding that Dr. Makky was given adequate opportunity to meaningfully object to the decision to deny his security clearance, there was no Due Process violation.

B.   Count Four - Harmful Error under the CSRA

Dr. Makky alleges that the CSRA was violated when: (1) he requested the FBI background investigation file on which the Initial Determination to suspend him was based, and the OPM and FBI thereafter "responded with a series of incomplete and inconsistent document productions" (Compl. ¶ 61); and (2) Mr. Burke, who was biased against Dr. Makky because of his national origin and religion, made the decision to suspend Dr. Makky

28

without pay.

An agency's action can be reversed due to procedural error if Plaintiff demonstrates "harmful error in the application of the agency's procedures in arriving at such decision." 5 U.S.C. § 7701(c)(2)(A). Harmful error is defined as "[e]rror by the agency in the application of its procedures that is likely to have caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error . . ., i.e., [error] that . . . caused substantial harm or prejudice to [appellant's] rights." 5 C.F.R. § 1201.56(c)(3).

Defendants' motion for summary judgment will be granted as to the second allegation. Dr. Makky fails provide a factual basis beyond the allegations in the Complaint, does not cite any provision of the CSRA that was violated by Mr. Burke's role in his suspension, and does not present any legal authority in support of this allegation. The claim appears to be one of discrimination or retaliation, both of which this Court has already addressed.

As to the first allegation, Dr. Makky has not shown that but for the agency's failure to produce classified documents, delay in producing unclassified documents, and purportedly inconsistent redacting, the agency likely would not have suspended him. He does not point to one document that was belatedly produced that he could have relied upon in appealing to the agency that it

29

incorrectly denied his security clearance.

Moreover, we cannot review the propriety of the decision to mark certain documents as "classified," and in turn, not release them to Dr. Makky for review. Under the doctrine of separation of powers, the executive branch has the "authority to classify and control access to information bearing on national security." *Egan*, 484 U.S. at 527 (emphasis added). "[C]ourts are often ill-suited to determine the sensitivity of classified information." *People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1242 (D.C. Cir. 2003), *citing United States v. Yunis*, 867 F.2d 617, 623 (D.C. Cir. 1989) ("Things that did not make sense to [a judge] would make all too much sense to a foreign counter intelligence specialist. . . ."). Thus, "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Id.* at 530.

Here, Congress has expressly provided that,

> no employee in the executive branch of Government
> may be given access to classified information by any
> department, agency, or office of the executive
> branch of Government unless, based upon an
> appropriate background investigation, such access is
> determined to be clearly consistent with the
> national security interests of the United States.

50 U.S.C. § 435(a)(1); *see also* Exec. Order. No. 13292 (March 25, 2003) (granting the executive department the power to classify

30

information and grant access to classified information).  The agency's failure to divulge classified information, therefore, cannot be attacked in court by claiming that such failure resulted in a denial of process.[22]

Because we agree that Dr. Makky was given an adequate opportunity to respond, and because the power to make classification decisions rests with the agency and cannot be reviewed by an AJ or by this Court, we will grant summary judgment to Defendants on Count Four of the Complaint.

## V.

Defendants move for summary judgment on Count Five of the Complaint, which alleges that Chertoff, Hawley, DHS, and TSA violated the CSRA, 5 U.S.C. § 2302(b)(9)(A), when they suspended Dr. Makky without pay in retaliation for contesting the Initial Determination to revoke his security clearance and for submitting FOIA / Privacy Act requests for his background file.  Dr. Makky asserts that his suspension without pay was a prohibited personnel practice under the CSRA, 5 U.S.C. § 2302(b), and the

---

[22] We reject Dr. Makky's claim that we must remand this issue for the AJ's determination because he did not expressly decide whether the alleged error, if any, was harmful.  Based upon the discussion contained in AJ Garrety's Initial Decision, p.4, we find that he did, in fact, rule that the TSA provided Dr. Makky with an adequate opportunity to make a meaningful response, despite the fact that he was not provided with his entire file for review.

MSPB erred in sustaining this employment action under the CSRA, 5 U.S.C. § 7701(c)(2)(B).  AJ Garrety, as affirmed by the MSPB, held that Dr. Makky failed to establish a *prima facie* case of retaliation.  This decision must be reviewed on the administrative record.  5 U.S.C. § 7703(c).

In order to establish a *prima facie* case of reprisal, a plaintiff must show: (1) he engaged in protected activity; (2) defendant knew of such activity; (3) under the circumstances, the adverse action could have been retaliatory; and (4) a genuine nexus exists between the retaliation and the adverse action. *Webster v. Department of Army,* 911 F.2d 679, 689 (Fed. Cir. 1990).  AJ Garrety applied this test and found that Dr. Makky met steps one, two, and three, but failed to meet the nexus requirement of step four.  (Def. Ex. 1, p.8).

The nexus element requires a plaintiff to produce "evidence from which the AJ can properly infer that the retaliatory motive caused the adverse action." *Webster*, 911 F.2d at 689.  This inference can be made from evidence of other employees at Plaintiff's agency who engaged in similar conduct but received more lenient treatment. *Id.* at 689-90.  Dr. Makky offered testimony that, in 1999, another employee engaged in comparable conduct and was not suspended, but rather was transferred to a position that does not require a security clearance. (Def. Ex. 1, p.9).

32

As found by AJ Garrety, this bare assertion, without more, is insufficient to prove retaliation.  However, even if Dr. Makky's contention about the other employee satisfies his *prima facie* burden, he must do more than merely state a claim in order to defeat Defendants' motion for summary judgment -- "[]he must establish that, viewing the administrative record as a whole, the AJ's ruling was not supported by substantial evidence."  5 U.S.C. § 7703(c); *Harold v. Barnhart*, 450 F. Supp. 2d 544, 555 (E.D. Pa. 2006).  He cannot meet this burden.

In failing to find a nexus, AJ Garrety determined "there is little reason to believe that either Mr. Burke or anyone else associated with the taking of adverse action against [Dr. Makky] had a strong motive to retaliate from his protected activities. Those activities, for example, did not involve any decision for which Burke or his staff was responsible."  (Def. Ex. 1, p.8). This finding is supported by the evidence.

The protected activities alleged - namely, Dr. Makky's submitting FOIA / Privacy Act requests for his background file - were not made to the individuals in his department who decided to suspend him.  The record does not contain any evidence that anyone linked to the decision to suspend him was motivated by retaliation.  Furthermore, Dr. Makky offered no argument, factual or legal, in opposition to Defendants' motion for summary judgment on this issue.

The record is clear that the denial of his security clearance was the reason for his termination.  As AJ Garrety found, even assuming that Dr. Makky set forth a *prima facie* case of retaliation, the agency had "unassailable, independent grounds for taking adverse action against him based on the OTVC's initial decision revoking his access to classified information."  (Def. Ex. 1, p.9).  This conclusion is supported by the record.  Based upon the aforementioned reasons, summary judgment will be granted to Defendants on Count Five.

## VI.

Dr. Makky alleges that the OPM and FBI failed to "make promptly available all the records sought by [his] requests, in violation of the FOIA, 5 U.S.C. § 552(a)(3)(A)," (Compl. ¶135) and in further violation of the Privacy Act, 5 U.S.C. § 552a(d)(1).  Defendants move for summary judgment. Plaintiff's, in turn, move for an in camera review of the documents that the FBI withheld in full, and those which were redacted.

FOIA requires disclosure of government records unless the requested information falls within one of the nine statutory exceptions.  *See* 5 U.S.C. § 552(b).  A district court has jurisdiction to compel disclosure of records from an agency only when the records were improperly withheld.  *Kissinger v. Reporters Comm. for Freedom of Press*, 445 U.S. 136, 150 (1980); *see also* 5

34

U.S.C. § 552(a)(4)(B) ("the district court of the United States . . . has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. . . . the court may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions").  The agency must produce any "reasonably segregable portion" of the withheld documents, 5 U.S.C. § 552(b), and must demonstrate that all such information was released.  *See Davin v. United States DOJ,* 60 F.3d 1043, 1052 (3d Cir. 1995).

The district court's review of an agency decision to withhold information is *de novo. Id.*  Because information exempted under FOIA is also exempted under the Privacy Act, 5 U.S.C. § 552a(k)(1), the Court will analyze the propriety of the agencies withholding of information under FOIA and the Privacy Act simultaneously.

"An agency is entitled to summary judgement only 'when the agency's affidavits describe the withheld information and the justification for withholding with reasonable specificity, demonstrating a logical connection between the information and the claimed exemption . . ., and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Pipko v. CIA*, 312 F. Supp. 2d 669, 674 (D.N.J. 2003), *quoting Davin v. United States Dep't of Justice*, 60 F.3d 1043, 1050 (3d Cir. 1995).

35

Defendants bear the burden of proving that the withheld information falls within the exemptions they invoke.  5 U.S.C. § 552(a)(4)(B).  They can satisfy this burden by providing affidavits describing the information withheld and the reasons that the information falls under the claimed exemptions.  *See ACLU v. United States Dep't of Justice*, 265 F. Supp. 2d 20, 27 (D.D.C. 2003).  "[A]t least in the national security context, the reviewing court must give 'substantial weight' to such affidavits."  *Id.* (quoting *King v. Dep't of Justice*, 830 F.2d 210, 217 (D.C. Cir. 1987)).

Defendants seek to invoke exemption 1, which provides that information "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" is exempt from disclosure.  5 U.S.C. § 552(b)(1).  The agency relies upon Executive Order 12958, as amended, 68 Fed. Reg. 15315 (March 25, 2003).

We have broad discretion whether to conduct an in camera review.  *See Center for Auto Safety v. EPA,* 731 F.2d 16, 20 (D.C. Cir. 1984)("upon review of the plain language of the FOIA, the legislative history, and the relevant caselaw, it becomes apparent that Congress intended to impose no mandates upon the trial court" as to whether to conduct an in camera review).  "[W]hen dealing with documents to which § 552(b)(1) applies courts are expected to accord 'substantial weight' to the agency's affidavit."  *Patterson*

36

*v. FBI*, 893 F.2d 595, 601 (3d Cir. 1990), *citing American Friends Serv. Com. v. Dep't of Defense*, 831 F.2d 441, 444 (3d Cir. 1987).

Because Dr. Makky disputes the propriety of withholding of information by the FBI, we will look to the Declaration of David M. Hardy, Section Chief of the FBI's Record/Information Dissemination Section, in order to decide whether an in camera review of the documents is necessary.  (Def. Ex. 10).  At issue are ten pages from Dr. Makky's FBI file, three of which have been withheld, and seven of which have been disclosed in redacted form.  These documents are marked by the FBI to indicate the justification for which the documents were deemed classified and, thus, not disclosed.

As Mr. Hardy explained, the information withheld on all ten documents contains intelligence information used by the FBI to "gather, store or disseminate intelligence information." (Hardy Decl. ¶23).  In accordance with *Vaughn v. Rosen,* 484 F.2d 820 (D.C. Cir. 1973), Mr. Hardy first set forth the reasons that classified information containing intelligence information and information about foreign relations activities, such as the information in Dr. Makky's file, must remain confidential.  Then, Mr. Hardy listed the specific categories of classified information that were redacted on each document, and provided an explanation of those categories, which included: the character of the case, which identifies the specific type of intelligence activity directed at a specific

37

target; targets of foreign counterintelligence investigation; and intelligence information about or from a foreign country. (Hardy Decl. pp. 8-11).

Based upon a review of the detailed Hardy Declaration, the Court is satisfied that Defendants have met their burden of justifying the exemption they claim under FOIA and the Privacy Act.[23]   Moreover, the justifications given are not contradicted by the record and there is no evidence of bad faith.   *See Carter v. United States Dep't of Commerce,* 830 F.2d 388 (D.C. Cir. 1987)(noting that in determining whether to hold an in camera review, a court should consider whether the agency's affidavit's are conclusory, and whether there is evidence bad faith). Accordingly, an in camera review of the documents is not necessary. *See Pipko v. CIA,* 312 F. Supp. 2d 669, 680 (D.N.J. 2003)("when [an agency] adequately meets its burden of justifying FOIA exemptions through affidavits or declarations . . . there is no need for a court to conduct an in camera review of records"); *Quinon v. FBI*, 86 F.3d 1222, 1228 (D.C. Cir. 1996) ("in camera review should not be resorted to as a matter of course").

---

[23] The Court is not in a position to second-guess agency decisions relating to the segregability of non-exempt information when the information withheld implicates national security concerns.   Therefore, the decision in *Abdelfattah v. U.S. Dep't of Homeland Security*, No. 06-4106, --- F.3d ----, 2007 WL 1544503 (3d Cir. May 30, 2007), remanding the question to the district court of whether all reasonably segregable portions of withheld documents were disclosed, is not applicable in this context.

Defendants also rely on exemption 3 for documents withheld by the OPM and the CIA.  Exemption 3 applies to matters that are "specifically exempted from disclosure by statute . . . provided that such statute [] requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or [] establishes particular criteria for withholding or refers to particular types of matters to be withheld[.]" 5 U.S.C. § 552(b)(3).

In order to determine whether the OPM and CIA properly withheld information pursuant to FOIA exemption 3, we must first determine whether the statute cited by Defendants is covered by the exemption, and if so, whether the withheld information falls within the scope of the statute. *See CIA v. Sims,* 471 U.S. 159, 167 (1985); *A. Michael's Piano, Inc. v. FTC*, 18 F.3d 138, 143 (2d Cir. 1994).  The statute upon which Defendants rely, section 6 of the Central Intelligence Agency Act ("CIAA"), 50 U.S.C. § 403g, exempts the CIA from other laws requiring the disclosure of CIA "functions, names, official titles, salaries, or numbers of personnel employed by the agency." *Id.*  CIAA § 403g clearly falls within the ambit of exemption 3.

> [Section] 403g 'refer[s] to particular types of
> matters to be withheld' namely, information
> respecting intelligence sources and methods. Rep.
> Abzug, the amendment's primary sponsor in the
> House, explicitly stated on the floor that § 403g
> was one of the statutes intended to qualify under
> the new Exemption 3 [] The only courts to consider
> the issue have held that the amendment left the

Exemption 3 status of . . . § 403g unimpaired. []
Scholarly commentators have reached the same
conclusion.

*Goland v. CIA,* 607 F.2d 339, 350 (D.C. Cir. 1978).

Next we must decide whether the information withheld is
covered by the statute.  CIAA § 403g has been characterized as
providing a "near-blanket" exemption under which nearly all CIA
documents are excluded from the disclosure requirements of FOIA.
*Pipko v. CIA,* 312 F. Supp. 2d 669, 679 (D.N.J. 2003).  Here, the
CIA declined to state whether there are any documents in its
possession responsive to Dr. Makky's request, as doing so could
reveal intelligence methods and activities, or the names and
locations of internal CIA components. (Dove Decl. ¶¶ 7, 10-20).
The CIA may respond in this manner, termed a *Glomar* response,[24] if
its affidavits provide adequate justifications for why it refuses
to confirm or deny the existence of documents.  *Pipko*, 312 F. Supp.
at 679.

The Dove affidavit, submitted by the CIA, sets forth in detail
the reasons why it would be harmful to provide such information.
Because the Court holds that the CIA's affidavit is satisfactory,
and in camera review of relevant CIA records, if any, is not
appropriate. *Id., citing Wheeler v. CIA,* 271 F. Supp. 2d 132, 141-
42 (D.D.C. 2003).

---

[24] *Phillippi v. CIA*, 546 F.2d 1009, 1011 (D.C. Cir. 1976).

Accordingly, Defendants' motion for summary judgment on Counts Six and Seven will be granted.  Dr. Makky's application for an in camera review of the documents withheld by defendants will be denied.

## VII.

For the reasons set forth above, the Court will grant Defendants' motion to dismiss the employment discrimination claims found in Counts One, Two, and Three.  The Court will grant summary judgment for Defendants on Counts Four, Five, Six, Seven, and the allegations of CSRA violations in Count Three.  Additionally, upon a review of the record, the Court does not believe that further discovery is warranted.  Accordingly, the Court will deny Plaintiff's Cross Motion to Continue Summary Judgment under Fed. R. Civ. P. 56(f).  The Court will issue an appropriate order.

Dated: May 31st , 2007.

s/ Joseph E. Irenas
JOSEPH E. IRENAS, S.U.S.D.J.

41